SAM SARKISSIAN, as Parent and Guardian of Sonya Sarkissian, a Minor, Plaintiff-Appellant, v. THE CHICAGO BOARD OF EDUCATION, Defendant-Appellee.

First District (5th Division)    No. 1—98—3061

Opinion filed September 30, 1999.

138

Fishman, Fishman & Saltzberg, P.C., of Chicago (Michael P. Barone and Carol Collins, of counsel), for appellant.

Gino L. DiVito, Michael I. Rothstein, and Lisa M. Hegedus, all of Quinlan & Crisham, Ltd., of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

In January 1988, plaintiff Sam Sarkissian, as parent and guardian of Sonya Sarkissian, a minor, filed a personal injury action against defendant Chicago Board of Education (Board), delivered a summons and a copy of the complaint to the sheriff of Cook County, upon which the sheriff acknowledged service of summons. After the Board failed to file an appearance, plaintiff notified the Board, by certified mail, return receipt requested, that he would be seeking the entry of a default judgment. Subsequently, on three different and independent occasions, the trial court found the Board to be in default. The trial court then entered a default judgment against the Board in the amount of $10 million.

Plaintiff filed a petition to revive the $10 million default judgment in 1997. In response, the Board contested the entry of the judgment, asserting that the service of process for the underlying personal injury complaint in 1988 was defective. Plaintiff now appeals the trial court's order vacating the default judgment as void for lack of jurisdiction based on defective service of summons upon the Board.

The primary and dispositive issue on appeal is whether the service of process on the Board in February 1988 was effectuated in accordance with the governing statute, i.e., section 2—211 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—211 (now 735 ILCS 5/2—211 (West 1998))). In the alternative, plaintiff asserts that the doctrine of equitable estoppel applies to the facts of this case and precludes the Board from contesting the service of process. We find that the service of summons and complaint was valid and, thus, need not address plaintiff's alternative position based on equitable estoppel. Accordingly, we reverse the trial court's order vacating the default judgment and remand the matter to the circuit court for consideration of plaintiff's petition to revive the default judgment.

On January 26, 1988, plaintiff filed a personal injury action against the Board. The complaint alleged that the minor, Sonya Sarkissian, was an eight-year-old student enrolled in special classes and on September 24, 1985, she suffered an epileptic seizure while attending school. Before the minor's seizure, the Board was aware that the minor was an epileptic. The complaint further alleged that, at the

time of the minor's seizure, the Board failed to contact or provide proper medical authorities. The record further reveals that, as a result of her seizure, the minor suffered brain damage and is now a quadriplegic.

On February 1, 1988, a deputy sheriff, Marvin Thomas, delivered a summons addressed to the Chicago Board of Education at 1819 West Pershing in Chicago, *i.e.*, the Board's corporate headquarters. The summons was given to and accepted by Yolanda Chavez, who was then working as the receptionist in the Board's law department. The return of summons establishes that Thomas served the summons on February 1, 1988, to "M. Chavez." The summons was then date stamped "Feb 03 1987 [*sic*]" (1988). In turn, the summons was routed to one of the Board's assistant attorneys, John Wren.

Wren testified in his deposition that he reviewed the documents, determined that the matter involved a personal injury action, and wrote the words "personal injury" on the documents for the purpose of directing them to the law division's workers' compensation/personal injury division at 188 West Randolph. Wren forwarded the complaint on or about February 4, 1988. Wren recalled that in 1988, Robert Wilson was in charge of the workers' compensation/personal injury division.

Wilson testified in his deposition that, after he reviewed the matter, he routed the documents (summons and complaint) to Martin Boyer Company (hereinafter Martin Boyer) by letter dated February 9, 1988. Martin Boyer was the Board's third-party claims administrator and claims adjustor. Martin Boyer was in charge of the Board's personal injury cases and was responsible for referring the cases to outside counsel for handling. Wilson testified that a daily pickup and delivery system existed from the 188 West Randolph office to Martin Boyer.

After the Board failed to file an appearance, plaintiff, on July 28, 1988, sent the Board notice of his motion that he would be seeking the entry of a default against the Board "as the [Board] was served on February 1, 1988, but has failed to appear or answer." Plaintiff sent this notice via certified mail and the Board received it on July 29, 1988.

On three separate subsequent occasions, defendant was found in default. On August 29, 1988, the trial court (Judge Willard J. Lassers) granted plaintiff's motion to enter a default judgment against defendant, stating that defendant was served on February 1, 1988, but failed to appear or answer. Judge Lassers also ordered the matter for prove-up. On January 29, 1990, Judge Lester D. Foreman held defendant in default, finding that defendant failed to appear to answer the

trial call. On March 27, 1990, Judge Angelo D. Mistretta entered an order holding defendant to be in default. Finally, on April 17, 1990, the trial court entered a default judgment against defendant in the amount of $10 million.

On August 25, 1997, plaintiff filed a petition to revive the default judgment entered on April 17, 1990. On September 2, 1997, defendant was served with summons in connection with the petition for revival of judgment. It is interesting to note that this summons was served in the same manner as the previous summons, *i.e.*, not being served on the president or secretary of the Board but, rather, on a receptionist (June McBride). On October 1, 1997, defendant filed an appearance.

On November 5, 1997, defendant filed its motion to vacate the default judgment, which was the subject of plaintiff's revival petition, on the grounds that the service of process performed on February 1, 1988, was defective and did not comply with the statutory requirements of section 2—211. Based on its assertion that service was improper, defendant maintained that the trial court had lacked jurisdiction to enter a default judgment.

During the course of discovery, the depositions of 12 persons, including former and current officers and employees of the Board, were taken. The deponents and their respective positions in February 1988 were: (1) Frank Gardner, the president of the Board; (2) Patricia Whitten, the chief counsel of the Board; (3) John Wren, the first assistant attorney for the Board; (4) Thomas Corcoran, the secretary for the Board; (5) Norma L. Tsuhako, the assistant secretary for the Board; (6) Robert A. Wilson, an assistant attorney for the Board; and (7) Yolanda Chavez, the receptionist for the Board's law department. Two former Board employees testified: Nancy Faulk, a former receptionist and clerical clerk in the law department, and Corkye Wills, a former office manager in the law department. Two deponents testified as to their separate investigations into the matter: William Morgan, a current assistant attorney for the Board and the successor of Wilson, and John Patton, an account manager at Martin Boyer. In addition, Marvin Thomas, the deputy sheriff who served the subject summons and complaint, testified.

The record, based upon these depositions, reveals that at the time of the contested service (February 1988), the Board and its law department shared premises at 1819 West Pershing Road in Chicago. The president of the Board, the secretary of the Board and support personnel were located on the sixth floor. The Board's law department, including its chief counsel, was located on the fifth floor. The law department also maintained offices at 188 West Randolph Street, which included the divisions for personal injury and workers' compensation.

The documents and testimony establish the route taken by the subject summons and complaint. A deputy sheriff (Thomas) delivered the subject summons and complaint to the fifth floor at Pershing Road. The receptionist for the law department (Chavez) accepted and date-stamped the documents. The first assistant attorney for the Board (Wren) reviewed the summons and complaint, wrote "personal injury" on the documents, and designated that the case be sent to the West Randolph Street office for handling. An assistant attorney in the West Randolph Street office (Wilson) received the subject documents and forwarded the case to Martin Boyer by letter dated February 9, 1988. A daily pickup and delivery system was in effect between the 188 West Randolph Street office and Martin Boyer. On July 29, 1988, the Board was notified by certified mail that plaintiff would be seeking a default judgment because the Board never filed an appearance. In 1991, when he was hired to succeed Wilson as an assistant attorney for the Board in the West Randolph Street office, Morgan was assigned to review the status of cases that had been sent to Martin Boyer. In his investigation, Morgan found that the file on the subject claim had been closed on September 22, 1989. Martin Boyer no longer has any paper records of the case because the files were destroyed pursuant to a record retention policy.

In her deposition, Whitten, the chief counsel for the Board, testified that she "was in charge of the law department and in charge of all litigation and legal matters concerning the Board of Education." As the Board's attorney, Whitten "reported directly to the Board by statute." Whitten testified that the receptionist in the law department had the authority to accept service of summons on behalf of the Board and it was part of her duties and that the law department "would accept service as a matter of accommodation." This practice was in existence when Whitten became the Board's attorney and she is not aware of how it came into effect. Although Whitten "never received any specific authority" to accept service of summons for the Board, she continued the practice during her tenure as it existed since at least 1980. When asked whether she was ever informed or made aware "that the law department was acting outside of its scope of authority to accept service of summons on behalf of the" Board, Whitten responded: "I think it has statutory authority. *** I think the statute left that up to the attorney for the Board. *** What I think is that the attorney had the authority to determine the practice that was used. *** I think that was within the attorney's discretion." The practice in the office was for the person sitting at the receptionist desk to accept incoming summons. Whitten further testified that she, as an attorney for the Board, was one of its agents.

Whitten testified that Martin Boyer was "a vendor hired by the Board to handle claims." When Martin Boyer received the summons and complaint, it was required "to investigate it and assign outside counsel to it." Once the documents were submitted to Martin Boyer, the law department had no direct responsibility; however, on some particular cases, there might have been some consultation. Whitten is not aware of the present case and does not know what Martin Boyer did with it. Whitten is not aware of any personal injury case where the Board contested jurisdiction on the grounds of improper service after the law department was served with summons and complaint. To her knowledge, the Board was unaware of the procedure going on in the law department concerning acceptance of summonses. When asked whether she considered it inappropriate for the receptionist to accept service of summons, Whitten replied: "I can't answer the word inappropriate. I mean, it did not comply with the statute, but it was a practice of ours to do so for accommodation reasons."

Frank Gardner was president of the Board from about 1987 to 1989. The position of Board president was a volunteer position. Gardner did not recall ever receiving a service of summons and acknowledged that it was one of his duties as president. In his absence, Gardner believed that several other persons could accept service of summons, including the vice-president, any officer of the Board, the secretary of the Board, and Whitten:

"Q. Now in February of 1988, did Patricia Whitten have authority to accept service of summons on behalf of the Chicago Board of Education?

A. In her position I would suppose she would.

Q. Did the secretary of the Board of Education have authority to accept service of summons?

A. I would think so.

Q. And if service of summons was effectuated upon either the Department of Law or the secretary of the Board of Education, you considered that to be good and valid service on the Board of Education, correct, sir?

A. I would think so."

Gardner understood that Whitten's responsibilities were "[t]o handle and interpret legal matters." Gardner never delegated, either orally or in writing, any authority to anyone to accept service of summons on his behalf. Gardner did not remember ever observing any deputy sheriff serving any person in the Board with service of summons and complaint. Gardner testified that if the personnel from the law department had accepted service of summons, he would consider that to be good and valid service on the Board. No one ever attempted to serve Gardner with a summons.

Thomas Corcoran was the secretary for the Board from 1981 to 1993. Unlike the position of president (Gardner), the position of secretary was not a voluntary position and Corcoran was basically at the office every day. Corcoran considered the position of secretary to be analogous to the position of "clerk" as stated in the statute (section 2—211). As the secretary, Corcoran considered himself the person to be served with summons and, in his absence, the person would be the assistant secretary, who was Norma Tsuhako. When he was served with summons, Corcoran would sign for the papers and then the papers would be forwarded to the law department. After transmitting the papers, the secretary had no other involvement in the matter.

Throughout his tenure, Corcoran testified that he never observed any personnel accepting service of summons from the sheriff or deputy sheriff other than the secretary, assistant secretary, or president. However, he also testified that while at the Pershing address from 1984 to 1988, he never observed the president accepting service of summons.

If service of summons had been accepted by the assistant secretary or the receptionist on the sixth floor, Corcoran would consider that to be good and valid service. Corcoran does not know of any differences in the duties of the receptionist on the sixth floor and the receptionist on the fifth floor. Corcoran further testified that in February 1988 the authority for acceptance of service of summons was not delegated to the receptionist/executive secretary. Corcoran was not aware that the law department was, in fact, accepting service of summons on behalf of the Board. Corcoran described the attorney for the Board as "an independent officer reporting directly to the Board."

Norma L. Tsuhako was an assistant secretary for the Board from 1981 until 1993. Her duties were to perform the responsibilities of the secretary (Corcoran) should he be unable to act. Referring to section 2—211, Tsuhako testified that there was not a clerk of the Board and there were two officers of the Board at that time, i.e., the president and the secretary, and each officer had the duty to accept the summonses.

Tsuhako testified that the president was "a volunteer" and was engaged in other employment and, therefore, would not be "at the Board regularly." The president was seldom at the office and Tsuhako could not recall observing the president accepting service of summons. Tsuhako further testified that the Board's receptionist had the responsibility to accept service of summons on behalf of the Board and that the president gave the receptionist the authority to accept service of summons that was directed to the president. Tsuhako testified that if the receptionist on the sixth floor accepted service of summons, she would consider that to be good and valid service on the Board.

Tsuhako further testified that, in the president's absence, the secretary (Corcoran) could accept service of summons and if the secretary was not available, Tsuhako accepted summonses. Other than the instant case, Tsuhako was not aware of any other case where the Board contested jurisdiction where the service of summons was issued upon the law department.

In her deposition, Yolanda Chavez, the receptionist for the law department in February 1988, could not recall receiving the summons for the present case. When she began that job, she was told to take the summonses, date stamp them, and pass them on to the secretary of the head counsel, i.e., Whitten. Chavez recalled receiving anywhere between 10 and 25 summonses in one day. Chavez testified that she was trained by Corkye Wills.

Corkye Wills, now known as Cornelia Jordan, was the office manager for the Board from 1985 until 1989 and her supervisor was Whitten. Wills supervised the support staff, including the receptionist, Chavez. Wills trained Chavez on telephone procedures only and denied training Chavez on procedures for service of summons. Wills testified that Nancy Faulk, one of Chavez's predecessors, spent time training Chavez at the reception desk.

Nancy Faulk worked at the Board from 1984 until 1997 and was the receptionist of the law department sometime between 1984 and 1985. Faulk was trained by Loretta Macula, the office manager who was the predecessor to Corkye Wills. Macula told Faulk to accept summonses and complaints on behalf of the Board. Faulk understood that she had a duty to accept such summonses and complaints. Faulk was not allowed to accept summonses and complaints that identified a person by name, such as the president or Whitten. During the 13 years that she worked at the Board, Faulk understood that the receptionist or whoever was sitting at the receptionist's desk would accept the summonses and complaints on behalf of the Board. Faulk testified that they were "just told to take them. They didn't give us no out. We couldn't say no." As the receptionist, Faulk received summonses and complaints from the sheriffs numbering 20 to 25 per day and sometimes more.

John Wren worked as first assistant attorney for the Board from 1983 to 1990. In 1988, Wren reported to and was directly below chief counsel Whitten at the Pershing Road address. The Board did not have a clerk. After Wren reviewed a complaint, he would designate the division to which it would be forwarded, such as the personal injury division at West Randolph, and place it in his out box. Wren recognized his handwriting stating "personal injury" on the summons issued in the present case. Wren testified that he must have read the summons,

determined it to be a personal injury case and accordingly directed it to the Randolph Street office. Wren was the supervisor of Robert Wilson.

Robert A. Wilson was an assistant attorney in the law department from 1982 until 1990, assigned to the workers' compensation/personal injury division at 188 West Randolph. Wilson's division also functioned as a liaison between the Board and Martin Boyer in regard to law division lawsuits against the Board. A daily pickup and delivery system was in effect between the 188 West Randolph offices and Martin Boyer. Wilson's office would forward summonses and complaints to Martin Boyer to handle, including any jurisdictional questions. Once the case had been forwarded, Martin Boyer was expected to choose a defense firm and handle the matter. Wilson understood that service was proper on the Board if it was served upon the Board attorney at the Pershing Road office.

Wilson further testified that although he had no absolute recollection of the letter sending the instant summons and complaint to Martin Boyer, he believed that the letter was prepared at his direction because his initials are on the letter. Wilson's successor was William Morgan.

William Morgan, an assistant attorney for the Board from 1991 to the present, testified that when he was hired, one of his responsibilities was to review the status of cases that had been sent to Martin Boyer. The day he reviewed the file on the instant initial complaint, Morgan wrote that the claim was closed September 22, 1989. Based on his investigation of the matter, Morgan concluded that an employee of the Board received the summons and complaint in this initial lawsuit and that employee was Chavez. Referring to section 2—211, Morgan understood that service of process is to be made to "the president or the clerk or analogous position, and the secretary is analogous to a clerk" because there is not a clerk.

Morgan further testified that there are no documents, letters, communications, or directives that refer in any way to the procedure employed by the Board to accept service of legal process from 1988 to the present time. The Board currently uses "Martin Boyer on a very, very limited basis." Martin Boyer no longer has any paper records of the present case because they were destroyed under a record retention policy, providing that the paper records are destroyed 10 years after the date of the accident.

John Patton, an account manager, began working for Martin Boyer in 1992. In 1988, Martin Boyer was responsible for appointing outside counsel for the Board. Now, Morgan at the Board, not Martin Boyer, appoints outside counsel for the Board. In his investigation, Patton

determined that no defense attorney had been solicited or hired to defend the Board in the present case. Patton testified that if Martin Boyer received the letter dated February 9, 1988, about the present case, there would have been an assignment letter to a defense attorney with a copy to the Board.

Patton discovered that a group of Martin Boyer's files had been destroyed in 1995. None of the records at Martin Boyer were microfiched or scanned into the computer. The only two ways information is maintained is either in the computer or by the actual paper documents.

Following discovery, the respective parties filed their appropriate pleadings. Plaintiff contended that service of the summons and complaint in 1988 was good and valid service. In turn, the Board filed its reply in support of its motion to vacate, asserting that service of summons and complaint on the receptionist did not comport with the dictates of section 2—211.

On July 16, 1998, the trial court heard oral arguments and continued the matter after asking counsel to prepare responses to questions posed by the court regarding the statute of limitations and its impact on the disposition of the default judgment matter. When the hearing continued on July 21, 1998, the trial court issued its ruling, vacating the default judgment, rejecting equitable estoppel as a bar to vacating the judgment, and reinstating the original cause of action. In its ruling in open court, the trial court ordered that alias summons would issue and a case management order would be set so that plaintiff would have a trial on the merits.

As a threshold matter, the Board asserts that this court lacks jurisdiction over this appeal, arguing that an order vacating a default judgment is not a final and appealable order. As stated by the Board, some case law has held that an order vacating a default judgment is *not* final and appealable. See *Nelson v. United Airlines, Inc.*, 243 Ill. App. 3d 795 (1993); *Stankowicz v. Gonzalez*, 103 Ill. App. 3d 828 (1981); *Alexander v. Burke*, 6 Ill. App. 3d 919 (1972); *Mabion v. Olds*, 84 Ill. App. 2d 291 (1967).

■ However, as submitted by plaintiff and acknowledged by the Board, this court held otherwise in *Cavanaugh v. Lansing Municipal Airport*, 288 Ill. App. 3d 239 (1997), in accordance with the second district's decision in *DiNardo v. Lamela*, 183 Ill. App. 3d 1098 (1989). In *Cavanaugh*, this court faced the same question regarding the finality and appealability of the trial court's order and acknowledged the same cases now advanced by the Board (*Nelson*, *Stankowicz*, *Alexander*, and *Mabion*). Notwithstanding these four decisions, this court in *Cavanaugh* held "that the trial court's order vacating the default

judgment due to improper service was final and appealable." *Cavanaugh*, 288 Ill. App. 3d at 244. In *Cavanaugh*, this court relied on the second district's decision in *DiNardo*, which also addressed the same line of cases and held that "where the judgment is vacated due to improper service *** an appeal may be had from this order." *DiNardo*, 183 Ill. App. 3d at 1103. We find that our opinion in *Cavanaugh* was properly decided and, thus, hold that we have jurisdiction of the present appeal.

■ The governing statute at issue is section 2—211 of the Code of Civil Procedure, which provides, in relevant part, that "summons may be served by leaving a copy *** with the president or clerk or *other officer corresponding thereto* in the case of any other public, municipal, governmental or quasi-municipal corporation or body." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 110, par. 2—211 (now 735 ILCS 5/2—211 (West 1998)). There is no dispute in the present case that neither the president of the Board nor anyone alleged to have been the clerk of the Board was served with the subject summons and complaint. Instead, we are called upon to construe the phrase "other officer corresponding thereto."

In construing this phrase, plaintiff asserts that the attorney for the Board constitutes an "officer" for purposes of section 2—211 and, in turn, she (Whitten) delegated her authority to accept service to the receptionist (Chavez). Thus, plaintiff maintains that the service of summons and complaint in February 1988 was valid. The Board, however, contends that the attorney for the Board was not an "officer" for purposes of section 2—211. Even assuming that the attorney for the Board is an officer, the Board argues that service of process on the receptionist for the law department did not conform to the mandate of section 2—211 and, thus, was not valid.

■ Section 2—211 does not define the term "officer" and neither the parties nor our research has revealed any judicial interpretation of the phrase "other officer corresponding thereto." The fundamental tenet of statutory construction requires a court to determine the intent of the legislature as it is revealed in the plain and unambiguous language in a statute. *City of East St. Louis v. Union Electric Co.*, 37 Ill. 2d 537, 542 (1967). Whenever a word or phrase used in a statute becomes an issue in a case, "its strict meaning is not as important as the sense in which it was used by the lawmaking body." *East St. Louis*, 37 Ill. 2d at 542. Moreover, "[a] statute capable of two interpretations should be given that which is reasonable and which will not produce absurd, unjust, unreasonable or inconvenient results that the legislature could not have intended." *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund*, 155 Ill. 2d 103, 110 (1993).

Furthermore, the language in a statute must be given "the fullest rather than narrowest possible meaning to which it is susceptible." *Collins*, 155 Ill. 2d at 111.

Section 2—211 cannot be more clear in providing that service of summons is valid when served upon an "other officer corresponding thereto." This designation is patently ambiguous. The ambiguity arises in determining who fits within the definition of "other officer."

■ The Board and the attorney for the Board are established and governed by statute, *i.e.*, the School Code (Ill. Rev. Stat. 1987, ch. 122, par. 1—1 *et seq.*). Since the facts of this case require us to construe the term "other officer" as it relates to the Board, *i.e.*, the statutory entity to be served, we find it appropriate to look to the School Code to consider whether the attorney for the Board holds the position of an "other officer." See *Lee County Board of Review v. Property Tax Appeal Board*, 278 Ill. App. 3d 711, 721 (1996) (even where two statutes are not strictly *in pari materia*, their language can be compared and, thus, the definition of "permanent foundation" from the Illinois Manufactured Housing and Mobile Home Safety Act (Ill. Rev. Stat. 1991, ch. 67½, par. 502) can be construed in harmony with the Revenue Act of 1939 (Ill. Rev. Stat. 1991, ch. 120, par. 482 *et seq.*)); *In re Marriage of Pick*, 119 Ill. App. 3d 1061, 1066-67 (1983) (the Code of Civil Procedure and the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 501) are *in pari materia* for purposes of construing the term "temporary restraining order").

In this regard, the Board submits that a reading of the School Code, as a whole, illustrates that the attorney for the Board is not an officer of the Board. Plaintiff, on the other hand, maintains that various provisions of the School Code grant the status of "officer" upon the attorney for the Board. We agree with plaintiff.

■ "The sections of the School Code are *in pari materia*, and they must be construed with reference to one another in order to give harmonious meaning to the act as a whole." *Maiter v. Chicago Board of Education*, 82 Ill. 2d 373, 389 (1980); *Lemont-Bromberek Combined School District No. 113(a) v. Walter*, 279 Ill. App. 3d 847, 850 (1996). In addition, the provisions of the School Code should be construed in light of the entire statutory plan. *Winks v. Board of Education of Normal Community Unit District No. 5*, 78 Ill. 2d 128, 135 (1979).

■ Section 34—15 of the School Code provided that the Board could appoint other officers and employees:

> "Other officers and employees. Pursuant to the provisions of the civil service law the board may *appoint*, or provide for the appointment of, such other *officers* and employees as it deems necessary, except as otherwise provided herein." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 122, par. 34—15.

In addition, the Board had the statutory power to determine the duties of its officers:

> "Powers of board respecting officers and employees. The board shall, subject to the limitations in this Article, prescribe the duties, compensation and terms of *office* of its *officers* and the duties, compensation and terms of *employment* of its *employees* and determine which of its officers and employees shall give bond, on what conditions, and in what amount." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 122, par. 34—16.

Notably, this statutory provision distinguishes between "officers," who are designated as having "terms of office," and "employees," who are designated as having "terms of employment."

In accordance with this authority, section 34—11 of the School Code specifically provided for the positions of attorney and assistant attorneys of the Board:

> "Duties of attorney—Assistants. The board by a majority vote of its full membership shall *appoint* an attorney who shall have charge and control, subject to the approval of the board, of the law department and of all litigation, legal questions and such other legal matters as may be referred to the department by the board or by the general superintendent of schools. *** The *attorney* shall hold this *office* for an indefinite term subject to removal by a majority vote of the full membership of the board." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 122, par. 34—11.

As the attorney is deemed to hold an "office," so also the president, secretary, and assistant secretary are designated as office holders:

> "President, vice-president, secretary. The board shall elect annually from its number a president and a vice-president, in such manner and at such time as the board determines by its rules. *** [The president] shall perform duties imposed upon him by the rules of the board. The vice-president shall perform the duties of the president if there be a vacancy in the *office* of the *president,* or in case of the president's absence or inability to act, and other duties imposed upon him by the rules of the board. The board shall elect a secretary and prescribe his duties, term of *office* and compensation. The board may elect an *assistant secretary,* who shall perform the duties of the secretary in case of the secretary's absence or inability to act, and other duties imposed upon him by the rules of the board. The board shall fix his term of *office* and compensation." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 122, par. 34—5.

Interestingly, in the instant appeal, the Board willingly acknowledges, and indeed advocates, that the then-secretary of the Board (Corcoran) and his assistant (Tsuhako) fell within the definition of "other officer

corresponding thereto."[1] Yet, the Board would deny the attorney for the Board the title "officer" apparently because the Board seeks to distinguish between an "officer" elected from its number under section 34—5 and an "officer" appointed pursuant to the provisions of the School Code. We find the Board's exclusivity theory to be unpersuasive.

The provisions of the School Code, read as a whole, demonstrate that the attorney for the Board is considered an officer of the Board. Section 34—15 authorizes the Board to appoint officers. Section 34—16 authorizes the Board to "prescribe the duties, compensation and terms of office of its officers" as distinct from the "terms of employment of its employees." Ill. Rev. Stat. 1987, ch. 122, par. 34—16. Section 34—11 governs the office of the attorney of the Board. We are further persuaded in our decision by the statutorily prescribed duties of the attorney of the Board. The attorney for the Board "shall have charge and control *** of the law department and of all litigation, legal questions and such other legal matters as may be referred to the department." Ill. Rev. Stat. 1987, ch. 122, par. 34—11. The record clearly establishes that the attorney for the Board, including Whitten and her predecessors, indeed exercised such control over the service of summons on a daily, regular, and long-standing basis. Chavez testified to being served with summons on 10 to 15 occasions per day and Faulk testified she was served 20 to 25 times per day, and sometimes more. To accept the Board's current position on appeal necessarily would mean that the Board, with full knowledge of the statutes at issue, blatantly and daily refused to accept its legal obligations.

Additionally, to illustrate the quandary facing any party that presently desires to serve the Board with summons, the current School Code provides that the Board's hierarchy includes a "president" and a "chief executive officer." 105 ILCS 5/34—3(a) (West 1998). In addition, the School Code provides a process for electing a vice-president from any of the Board members. 105 ILCS 5/34—3(b) (West 1998). The secretary, however, is selected by the Board and is an employee rather than a member of the Board. 105 ILCS 5/34—3(b) (West 1998). Amid this morass, who is an "other officer corresponding thereto"?

■ Under the facts of this case and the statutes at issue, we find, as matter of law, that the attorney for the Board fell within the defini-

---

[1] In its appellate brief, the Board specifically states that "plaintiff totally disregards the deposition testimony of then-secretary of the Board, Thomas Corcoran, and the then-assistant secretary of the Board, Norma Tsuhako, who testified as to their availability to receive summons on behalf of the Board as the 'other officer corresponding thereto.'"

tion of "other officer" for purposes of service of summons and complaint under section 2—211. Furthermore, we find that the attorney for the Board properly could delegate the responsibility for service of summons to other personnel in the law department just as the other officers of the Board delegated such responsibility to other personnel, such as the sixth-floor receptionist.

Our decision in the present case is consistent with our prior decisions in *Cavanaugh*, 288 Ill. App. 3d 239, and *Miller v. Town of Cicero*, 225 Ill. App. 3d 105 (1992), where we held that strict compliance with section 2—211 was required for attempted service upon a village under section 2—211. As it relates to a village, section 2—211 provides that "summons may be served by leaving a copy *** with the president of the board of trustees or village clerk in the case of a village." 735 ILCS 5/2—211 (West 1998). In *Cavanaugh*, the summons requested service on "Village of Lansing" and a sheriff's deputy delivered it to an employee of the village clerk. In *Cavanaugh*, this court, relying on section 2—211, held that "service on an employee of a village clerk is not proper service." *Cavanaugh*, 288 Ill. App. 3d at 245. Likewise in *Miller*, the plaintiff filed a personal injury action against, among others, the Village of Stickney. The summons directed the sheriff to serve "Village of Stickney, Village of Stickney Administration Building." A deputy sheriff left a copy of the summons with an employee with general clerical duties in the office of the Stickney village clerk. *Miller*, 225 Ill. App. 3d at 106. This court held that "the service was obviously not in compliance with the plain language of the statute," referring to section 2—211. *Miller*, 225 Ill. App. 3d at 110. Unlike the facts in *Cavanaugh* and *Miller*, the instant case does not involve service of summons on a village and does allow service of summons on an "other officer corresponding thereto." Like our holdings in *Cavanaugh* and *Miller*, we adhere in the present case to the principle that strict compliance with section 2—211 is necessary to effectuate valid service.

■ In conclusion, we agree with the Board that strict compliance with section 2—211 is required to effectuate valid service and, if the statute were not ambiguous, we would hold for the Board. Contrary to the Board's position, however, we find that service of the attorney for the Board, through her delegated representative, conforms to the dictates of section 2—211, which allows for service on an "other officer corresponding thereto" where the entity to be served is the Board. We cannot impose the requirement of strict construction to a statute that we find to be ambiguous. Although defective service cannot be cured by a defendant's actual knowledge of a case, proper service will not be denied by a defendant's inaction on a case.

The Board makes much of the fact that public funds are at risk

here; however, the operation of a public office and the availability of persons upon whom summons can be served are also before us. Indeed, the system established by the Board for acceptance of summons is for the benefit and convenience of the public officials. The president of the Board probably would not relish dozens of sheriff's deputies standing at the threshold of his home, waiting to effect what the Board now argues is proper service.

In light of our holding, we do not consider plaintiff's arguments based on equitable estoppel. We reverse the circuit court's order that vacated the default judgment and remand the matter for consideration of plaintiff's petition to revive the default judgment.

Reversed and remanded.

THEIS, P.J., and HARTMAN, J., concur.